The Judges pronounced their opinions.
JUDGE ROANE.
This was an ejectment brought by the appellant against Denny Fairfax, under whom the appellee claims, in the District Court of Winchester.
■ At the trial, the parties agreed a case in lieu of a special verdict. That case agrees, inter alia, various acts of Assembly respecting the territory of the Northern Neck, as is therein more particularly stated; the treaty of peace of 1783, between the United States and the King of Great Britain ; the act of 1784, 1 ‘respecting future confiscations;” that Eord Fairfax died, a citizen of this Commonwealth, in December, 1781, having devised his lands in the Northern Neck to Denny Fairfax, who was born in England in the year 1750, and'has never become a citizen of Virginia, or of any of the United States; that the land in controversy was a part of the lands in that territory called and described by Eord Fair-fax as waste and ungranted land; that the appellant obtained a grant therefor, from the Commonwealth of Virginia, on the 30th of April, 1789, entered, and was possessed in pursuance thereof until ejected; and that no inquisition of escheat or for-224 feiture was ever found *in relation to this land, under the ordinary acts on this subject, as extended to the said territory since the death of Eord Fairfax. : : ■ ! . l 1 ■ i i
Referring to the case itself for a more particular statement, these are the facts which seem most important in the present instance: there are other facts which seem to relate to the question whether Eord Fairfax had an absolute fee estate in the soil of the : : : ) : i said territory, or only a seignioral right thereto; a question unnecessary to be stirred in the present instance, as my opinion will go upon the admission that he had the former. The District Court gave judgment for the appellee, from which an appeal was taken by the appellant to this Court. It is necessary here to state that the judgment was rendered the 24th of April, 1794, which accounts for the omission to state in the case agreed, either the treaty of November 19, 1794, between the United States and Great Britain, or the act of compromise of October 10, 1796, between the Commonwealth of Virginia and the purchasers under Denny Fairfax.
On the part of the appellant it is contended, that Denny Fairfax was, at the time of the devise in question, and ever after, an alien, and incapable of holding lands in this Commonwealth; that, admitting an inquest of office to have been necessary under the general laws as applying to ordinary cases, the several acts of Assembly, stated in the case, respecting the mode of acquiring titles to waste and unappropriated lands in the Northern Neck, were equivalent thereto, and supplied the place thereof, in relation to such lands, and justified the grant by the Commonwealth.; and that the act of compromise of 1796, aforesaid, ceded the title to the appellant, even if it were not complete without it.
On the part of the appellee, on the contrary, it is contended, that the original appellee, Denny Fairfax, was capable of taking and holding the land devised to him, until devested by an inquest of office, 225 or some ^equivalent act; and that no such act had taken place prior to the treaty of peace, which, it is further alleged, protected his property, and released the right of the Commonwealth to the land in question : it is also contended, that the act of compromise aforesaid (being passed subsequent to the judgment in this case) does not affect it, and cannot be introduced into the cause so as to vary that judgment.
In the case of Reed v. Reed, (MS. April, 1805,) it was solemnly decided by this Court, that a man standing in the predicament of Denny Fairfax, is to be considered as an alien under our laws, and that the treaty of peace did not operate to protect or enlarge the inheritable rights of . British antenati accruing after the date thereof. These were the points actually before the Court in that case, and, therefore, judicially decided: every thing which may have fallen from any of the Judges in relation lo other points, or to topics not necessarily presented by the case, I conceive to be extrajudicial, and, as such, not entitled to the weight of binding authority. It was not, for example, decided, on the other hand, that the descents to British antenati accruing between the epoch, of the declaration of our independence and that treaty, were protected and enlarged thereby; or, in other words, that that treaty should be construed to arrest the operation of the ordinary laws of escheat and forfeiture of the seVeral states: much less was it decided, in that case, or any other within my knowledge, that- the several legislative acts *93 stated in the verdict were incompetent to perfect the title of the Commonwealth to the land in question, as being equivalent to inquisitions of office. As, however, although such were the only points necessarily and judicially decided in the case of Reed v. Reed, the question touching the operation of the treaty upon prior cases, was discussed much at large by myself, which question now stands for the opinion of this Court, I must beg leave to refer to a part of my opinion in that case, as containing the grounds of my opinion in this. What was then entirely extrajudicial, and inserted only from the difficulty of 226 taking *a partial view of the subject, I beg leave now to adopt and render judicial, it being called for by the actual question depending before us. I regret the necessity of reading any part of that opinion; which arises from the lapse of time since it was delivered, and the inconvenient circumstance that the decisions of this Court, of that period, have not yet seen the light, and exist only perhaps in a single manuscript. I regret it, however, the less, because I shall take the liberty, en passant, to fortify some of the positions then taken, by means of notes of some subsequent decisions in the Supreme Court of the United States, and other authorities. If the opinion is long, it must be admitted that the question is important; and I offer it also by way of apology, that we had then to explore the subject in the first instance.
[Here Judge Roane, read from the notes of his opinion in the case of Reed v. Reed, that part thereof which immediately relates to the present question.*]
I have thus endeavoured to shew by referring to and adopting the sentiments I delivered in the case of Reed v. Reed, that the treaty of peace has nothing to do with the laws of alienage of the several states; that, if it had any effect upon rights like the present, it would be to enlarge a null and defeasible interest into an absolute and indefeasible one, contrary to what is contended for, that the treaty was to protect rights antecedently existing, and that this construction (while there is no strong necessity for it) is opposed by many and insurmountable objections. In relation to cases happening after that treaty, the decision in Reed v. Reed is a direct authority in the negative: but the question relating to prior cases has never been decided, that I can learn, either in this Court or in the Supreme Court of the United States. It was not decided in the case of Marshall v. Conrad. (MS.) In that case Judges Fleming and Carrington expressly waived 227 the consideration of the '^operation of the treaty upon it, as being rendered unnecessary by the act of compromise of 1796. Judge Fleming considered the case, also, as embraced by the treaty of 1794; as to which, however, his opinion seems to be different from that of the Supreme Court of the United States in the case of Dawson v. Godfrey, 4 Cranch, 321, in which it was held, that a British antenata could not recover lands which descended upon her in Maryland, in the year 1793. Reposing in that case, therefore, upon the ground of the compromise, in which, I believe, the other members of the Court (myself dissenting) entirely concurred, these Judges did not enter into the great question now before us, which therefore is not concluded by that decision. As for the case of The Commonwealth v. Bristow, (MS., Spring term, 1806,) I consider it to be in favour of the appellants. While it decides that a confiscation, which is complete prior to the date of the treaty, (which I shall endeavour to shew was the case in the present instance,) is not affected thereby, it passes no opinion as to the operation of the treaty upon the ordinary laws of alienage of the several states; for the confiscation in question in that case was under the legislative act of 1779, which, the Court properly admitted, (without any inquiry as to the question of alienage,) vested all British property, then holden, in the Commonwealth, on the ground of its being the property of enemies; and that act (as I think the act of 1782 may be) was properly compared to a general bill of attainder. That decision, however, is important on account of the analogy which holds, as aforesaid, between the general inquisition (if I may so express it) contained in the act of 1779, and that resulting from the act of 1782, hereafter mentioned, for taking possession of the vacant lands in the Northern Neck. It is also important in deciding (or considering the case of Reed v. Reed to have decided) that British subjects were aliens here from the date of the declaration of independence, as is before abundantly stated; from whence it would follow that stronger expressions in the treaty would be necessary to 228 *operate the effect in question, than under a contrary supposition. The question before us is, therefore, I conceive, entirely open.
Being decidedly of opinion, for the reasons already stated, that neither the treaty of peace, nor the act of 1784 respecting future confiscations, related at all to the subject of alienage, it follows, in my judgment, that the act of 1785, c. 67, was undoubtedly competent to vest the possession of the vacant lands of the Northern Neck in the Commonwealth. Except for the bar supposed to be set up by the treaty, to the power of the legislature, this, I presume, would be admitted by the appellee’s counsel themselves: but, even admitting the application of the treaty to the case before us, I will go further and contend, that the title of the Commonwealth to the vacant lands of the Northern Neck was perfected before the date of that instrument.
Eord Fairfax having died in 1781, the legislature of the then sovereign State of Virginia, premising that they had reason to believe that the whole of that extensive territory had devolved on alien enemies,, turned their attention to the subject in October, 1782. By their act of that session, (a) they sequestered the quit rents then due in the hands of the land-holders, ordered all quit rents thereafter accruing to be paid into the treasury, and exonerated the said land-holders therefor. I know of no means, more efficacious than this, to have taken. *94 possession of the quit rents, and even of the granted lands in that territory, so far as a title thereto existed in Lord Fairfax; and, although in May, 1783, (a) they released to his executors all the quit rents due at the time of his death, they retained their hold on those subsequently arising, until they finally abolished them by the act of 178S. So much for the quit rents and granted lands in that territory. As to the vacant lands thereof, by their act of 1782, (b) after premising that by Lord Fairfax’s death great inconveniences would accrue to those inclined to make entries for vacant lands in the Northern Neck, they enacted “that all entries made with the surveyors 229 *of the Counties within the Northern Neck” (which entries were consequently authorized by the act) “shall be held deemed and taken as good and valid in law, as those heretofore made under the direction of the said Thomas Lord Fairfax, until some mode shall be taken up and adopted by the General Assembly, concerning the territory of the Northern Neck.” As there could be no conceivable motive with the Legislature to abstain from taking possession of those vacant lands, and granting them out, thereby to settle the country while it was taking possession of the quit rents and granted lands thereof, the authorizing entries to be made therefor, is as strong a mode as they could possibly have adopted to declare that they then and there took possession of the same. They took possession thereof, and made a temporary and provisional arrangement for granting it away, declaring, at the same time, their intention to adopt another and more definitive mode at a future time. That mode was adopted by the act of 1785, c. 57; in which, although the executive were directed to take possession of the land-papers of the Northern Neck, they were not directed to take possession of the vacant lands thereof: such possession had been taken by the act of 1782, and it would have been absurd to have directed it in any other way than by authorizing entries therefor, as the act of 1782 had done, and which amounted, ex vi termini, as is before said, to a declaration that the possession of such lands existed in the Commonwealth. On a comparison of this permanent act of 1785, with the temporary one of 1782 aforesaid, it will be found that the former is not only as deficient as the latter in providing any mode of taking possession of the territory other than that of authorizing entries therefor, and that in a manner not more strong than that contained in the act of 1782, but has also expressly recognised the entries authorized by that act, and provided for carrying the same into grant. When, therefore, the appellees admit the title of the Commonwealth to the territory in 230 ^question to have been complete, under the act of 1785, but for the alleged bar of the treaty of peace, they must also admit the same in relation to the act of 1782, which was prior to the treaty. By both those acts, the whole of that vacant territory was taken possession of by the Commonwealth; and, in relation thereto, the last act was a mere work of supererogation : in fact, this new and ridiculous idea of the necessity of ordinary and particular inquests of office, as applying to the case in question, or of any other symbol of investiture, than that most notorious one of all, (an act of the Legislature,) had not then occurred to the mind of the General Assembly: in relation to the Commonwealth, the mere assumption of the lands by law was sufficient, though, as to the grantees of the Commonwealth, other acts were necessary to complete their title: it is, however, enough to avoid the bar presented by the treaty that the title (including the possession) of the lands was then completely in the Commonwealth.
While this general inquisition of office, by the Legislature, (if I may so express myself,) was peculiarly adapted to the case of the estate of an individual, which pervaded a great number of the Counties of the Commonwealth, the power of the Legislature to substitute an act for an ordinary inquisition cannot be doubted. It is admitted that an act of Parliament in the reign of Philip and Mary, declaring the property of Sir Thomas Wyatt to be vested and in possession .of the King, without any inquest of office, was valid, (c) That case differs from the case at bar only in degree: and it cannot possibly make a difference that the inquest in that case is expressly waived by the act, whereas in the case before us, it is waived by a strong and necessary' implication only: the words are wanting, but are more than supplied by the actual measures taken by the Legislature, eodem flatu, to grant out the lands to others.
Upon this point of the competency of a general legislative act to supply the place of particular inquisitions of 231 *office, I consider the case of Kinney v. Beverley (d) as a direct and pointed authority. In that case, the title of the appellant was reprobated, only on the ground that the lands alleged to be vested in the Commonwealth, by reason of nonpayment of taxes, and which were regranted to,him, had not been listed by a County Commissioner. This was decidedly the ground of the decision of the Court in that case, as appears by the report thereof. Although the lands in dispute in that case stood upon a common foundation with those before us, both as to the want of particular inquisitions of office, and also as to the nonexistence of any other mode of taking possession thereof by the Commonwealth, except by authorizing grants to others, the above was the only ground on which the pretensions of the appellant failed: and this, although the necessity of particular inquisitions, as applying to every case, was suggested by counsel, and much laboured by one of the Judges of the Court. That case is much stronger in this respect than the case before us: for there the lands of thousands of individuals, who were not named in the act, and whose lands lay sparsim throughout the Commonwealth, were liable to be affected, whereas, in the case before us, the lands of one individual (by name) were taken into the hands of the *95 Commonwealth. In short, if this objection, for the want of a more particular inquisition, exists in this case, it equally exists in relation to the act of 1785, (considered as unaffected by the treaty,) and would go to overthrow every title acquired under it!
I am thus of opinion that the treaty of peace applies not to this case, nor to arrest the operation of the laws of alienage in the several states; and that, even if it does, the title of the Commonwealth to the land in question having been perfected by a seisin under the act of 1782, or, in other words, the confiscation being complete, that treaty had nothing left whereupon to operate.
This view of the subject makes it unnecessary for me to say much in relation to the act of compromise of 1796. (a) By the 232 compromise contained in that ’'act, the purchasers under Denny Fair-fax, in consideration of a release, by the Commonwealth, of its claim to “any lands specifically appropriated by Cord Fairfax to his own use either by deed or actual survey,” agreed to release to the Commonwealth ! ‘all claim to lands supposed to lie within the Northern Neck, which were waste and unappropriated at the time of the death of Cord Fairfax;” and the act has particular relation to, and was intended to settle and determine this, among other suits, then depending in this Court, touching the right to the said lands. Of this compromise the said purchasers have already availed themselves, by’ reversing two judgments in favour of the Commonwealth, on the 10th of October, 1798; a record of one of which is now before me. I consider the compromise as having been deposited with the Court for the purpose of settling all the causes embraced thereby, according to the provisions thereof: and I can never consent that the appellees, after having got the benefit thereof, should refuse to submit thereto, or pay the equivalent; the consequence of which would be, that the Commonwealth would have to remunerate the appellant for the land recovered from him ! Such a course cannot be justified on the principles of justice or good faith; and, I confess, I was not a little surprised that the objection should have been raised in the case before us.
On every ground, therefore, I am of opinion, that the judgment of the District Court should be reversed, and entered for the appellant.
JUDGE) FUEJMING.
The counsel for the appellant, who was plaintiff in the Court below, has made three points, in support of his cause;
1. That Denny Fairfax was, at the time of the decease of Dord Fairfax, and ever after, an alien, incapable of holding lands within this Commonwealth.
2. That the several acts of Assembly respecting the acquiring title to waste and unappropriated lands within the 233 *Northern Neck, were a sufficient inquest of office to authorize the granting the lands to the appellant. And,
3. That the act of compromise between the purchasers of Denny Farifax and the Commonwealth, vested the lands in Hunter, even if his title was not complete prior thereto.
With respect to the first point, the counsel seems to admit (by not denying it) the right of Uord Fairfax to devise the land in question, which renders an inquiry into the nature of his title unnecessary: we are then to consider whether Denny Martin was incapable of holding the lands so devised to him, lying within this Commonwealth?
It has been settled in the case of Marshall v. Conrad, (and I believe it is not, or ought not, to be controverted, at this day,) that an alien may take land within the Commonwealth by purchase, as well by devise as by grant or other conveyance, and hold the same until something further be done, to devest him of his right, to wit, office found; which must be done before any title can vest in the Commonwealth during the life of the devisee.
The case agreed between the parties, in the nature of a special verdict, finds, among others, two acts of Assembly passed in the year 1785, the first entitled, ‘ ‘An act concerning escheators.” (It should have been in the y’ear 1779 instead of 1785. )(b) And the other extending the operation of the former act to the several Counties in the Northern Neck: and then they agree that the lands in the declaration mentioned have not been escheated and seised into the hands of the Commonwealth, pursuant to the two acts of Assembly last mentioned, or either of them; and that no inquest of office of escheat hath been of and concerning the said lands. And this brings me to consider the second position of Mr. Williams, that the several acts of Assembly respecting the acquiring title to waste and unappropriated lands within the Northern Neck, were a sufficient inquest of office to authorize the granting the lands to the appellant ; and both of the counsel 234 argued that the Government, *or legislature, might have an office taken, and confiscate the lands by any mode they pleased. That, as a general principle, is not denied; but then the mode ought to be explicit, and clearly understood by all persons interested, and not by implication, that such and such acts of the legislature, by strained construction, amount to an office found, to deprive any person, whether citizen or alien, of their justly acquired rights. More especially, as the legislature had already acted on the subject, and by the acts of May, 1779, concerning escheators, and the amendatory act of October following, (c) clearly pointed out a mode by which, with great solemnity, those inquisitions of office were to be taken, giving to British subjects, or other persons in their behalf, the right of being heard before the General Court, by a monstrans de droit; and to any person other than a British subject, a right either to traverse the office, or to be heard on a monstrans de droit, in the General Court.
I proceed to examine the acts of Assembly, or clauses of them, as are supposed to amount to such an inquest of office as authorized the granting the lands to the appellant.
*96 The first that occurs is the 24th section of the act of 1782, c. 8. “To amend the several acts of Assembly for ascertaining certain taxes and duties, and for establishing a permanent revenue, into one act,” ■whereby, after suggesting in a preamble, that since the death of the late proprietor of the Northern Neck, there is reason to suppose that the late proprietorship hath descended upon alien enemies, it is enacted, “that persons holding land in the Northern Neck shall retain, sequestered in their hands, all quit rents which are now due, until the right of descent shall be more fully ascertained, and the- General Assembly shall make final decision thereon ; and all quit rents which hereafter may become due, within the limits of the said Northern Neck, shall be paid into the public treasury, under the operation of the laws of this session of Assembly; for which quit rents the inhabitants of the said Northern Neck shall be exonerated from the future claim of the proprietor.”
*At the same session of Assembly, an act passed, (c. 33,) entitled, “An act concerning surveyors,” in the 3d section of which, after reciting, that the death of the Eight Honourable Thomas Lord Fair-fax might occasion great inconvenience to those who might incline to make entries for vacant land in the Northern Neck, it was enacted that all entries made with the surveyors of the Counties within the Northern Neck, and returned to the office formerly kept by the said Thomas Lord Fairfax, should be held, deemed, and taken, as good and valid in law, as those before made under the direction of the said Thomas Lord Fairfax until some mode should be taken up and adopted, by the General Assembly, concerning the territory of the Northern Neck.
At this period, then, (October, 1782,) the Legislature was quite undetermined on the subject of this territory, and had done nothing that squinted at an inquisition of office: and, therefore there was, from any act of government at that time, scarce a semblance of a title vested in the Commonwealth ; as the clauses just above recited seem to have been enacted merely for the convenience of those who were resident, and had acquired permanent titles to their lands within the territory, and also of those who were taking steps to acquire titles to lands therein.
Thus the matter rested until the ratification of the treaty of peace, in September, 1783; at which time the land in question was held by Denny Fairfax, under the will of Lord Fairfax, as no confiscation thereof had ever taken place; and, by the 6th article of the treaty, it was stipulated that there should be no future confiscations made, or any prosecutions commenced, against any person or persons for, or by reason of, the part which he or they may have taken in the war, and that no person, on that account, should suffer any future loss, or damage, either in his person, liberty, or property. And so sacred was the treaty held by the Legislature of the state, that in an act passed in October, 1783, (c. 17,) prohibiting the migration of certain 236 persons *to this Commonwealth, there is a proviso that nothing therein contained should be construed so as to contravene the treaty of peace with Great Britain, lately concluded. And in October, 1784, (c. 53,) an act' passed, entitled “An act concerning future confiscations, ” in which, after reciting that it is stipulated by the sixth article of the treaty of peace that there shall be no future confiscations made, it is enacted, that no future confiscations, shall be made, any law to the contrary notwithstanding. With a proviso that the act should not extend to any suit depending in any Court, which commenced prior to the ratification of the treaty of peace; which treaty, aided by the last recited act, in confirmation thereof, completed, in my conception, the title of Denny Fairfax to all the lands devised to him by Lord Fairfax; in which he, by the devise, acquired the same interest as was vested in the devisor, at the time of his death; as the treaty, in my apprehension, by the general wording of the sixth article, operated as forcibly, and effectually, on the subject now under consideration, as if it had been specifically stipulated that the estate devised by Lord Fairfax to Denny Fairfax should not be confiscated; or, in other words, that it should not (nor any part thereof) be seised, taken, or appropriated to the use of the Commonwealth, and the act of lg7& had been penned in exact conformity to' such stipulation. It was a solemn compact of the highest nature and dignity known in civil society; and, if there be any thing ambiguous, or doubtful in it, ought to be construed in the most liberal and beneficial manner, in favour of the party for whose benefit there may be any article inserted therein; and ought not, in my conception, to have been contravened, or impaired, by any legislative act of our government. But it is contended that the act of 1785, c. 67, “for the safe keeping of the land papers of the Northern Neck in the register’s office” operated as an inquest of office, and gave to government the right of granting the unappropriated lands in the Northern Neck. To this I answer, that the treaty of 237 *peace, as recited above, and so solemnly recognised and acted upon, by the Legislature but the preceding year, absolutely forbids such a construction: and, it appears to me, therefore, that the granting the land in question to the appellant, in the year 1789, was an exercise of power, wthout a right.
3. We come now to consider the third point, 1 ‘that the act of compromise between the purchasers of Denny Fairfax and the Commonwealth, vested the lands in Hunter, even if his title was not complete prior thereto.” This point seems in favour of the appellant; and the only doubt and difficulty with me was, whether, as the act is not noticed in the case agreed, the Court ought, ex officio, to take notice of it? and, if so, the only question will be, whether the land in controversy had been specifically appropriated and reserved by Lord Fairfax, or his ancestors, for his or their use? On reflecting upon the subject, my doubt is removed. By a clause in our act, for limitations of actions, &c. private acts of Assembly may be given in evidence, *97 though not specially pleaded: a fortiori, shall public acts be noticed, in all cases, to which they apply; whether specially referred to, or not. By the act of compromise passed the tenth day of December, 1796, (at which time , there were several suits depending between the Commonwealth and those who claimed under the will of Lord Fairfax, in regard to their respective rights,) the immediate purchaser of Denny Fairfax, who claimed under the will of Thomas Lord Fairfax, gave up all claim to the lands supposed to lie within the Northern Neck, which were waste and unappropriated at the time of the death of Lord Fairfax, in consideration that the Commonwealth relinquished all claim to the lands specifically appropriated by the late Thomas Lord Fairfax, or his ancestors for his or their use. The case before us, then, comes expressly within the provisions of the act: and, it being stated in the case agreed, that the lands in the declaration mentioned are a part of the lands called and described as waste and unappropriated, within 238 *the said Northern Neck by the said Thomas Lord Fairfax; the title of Denny I^airfax, and of those who claim under him, was, by the act of compromise, clearly extinguished. And, upon that ground, and upon that only, I am of opinion that the law is for the appellant, and he must have judgment accordingly.
Judgment reversed, and entered for the appellant. And it appearing that appellant’s term in his declaration mentioned has expired, liberty was given him to amend the same by striking out the word “ten” and inserting the words “twenty-three. ’ ’
To this judgment the appellee obtained a writ of error from the Supreme Court of the United States;(a) which is now pending and undetermined.

See Appendix.

 Ch. Rev. p. 176, s. 24.

 Ibid. 206.

 Ibid. 180, c. 33 of Oct. session, s. 3.

 2 Tuck. Bl. p. 60, note C.

 2 H. & M. 344.

 Sess. Acts, c. 14.

 May, 1779, c. 45, Ch. Rev. 106.

 October, 1779, c. 18, Ch. Rev. 110.

 See Laws of the United States, vol. 1, p. 63, s. 25.